NOTICE

*The text of this opinion can be corrected before the opinion is published in the* <u>Pacific</u> <u>Reporter</u>. *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.us*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

ARTHUR J. AUGUSTINE,

Appellant,

v.

STATE OF ALASKA,

Appellee.

Court of Appeals No. A-11614
Trial Court No. 4FA-12-482 CR

O P I N I O N

No. 2464 — July 24, 2015

Appeal from the Superior Court, Fourth Judicial District, Fairbanks, Michael P. McConahy, Judge.

Appearances: Susan Orlansky, Feldman Orlansky & Sanders, Anchorage, for the Appellant. Tamara E. de Lucia, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for the Appellee.

Before: Mannheimer, Chief Judge, and Allard and Kossler, Judges.

Judge MANNHEIMER, writing for the Court and concurring separately.

Arthur J. Augustine was convicted of sexually abusing his two granddaughters. The State's evidence against Augustine was based almost completely on the out-of-court statements of the two children, which were conveyed to the jury

through video-recorded interviews of the children, as well as the hearsay testimony of other adults.

The trial judge admitted the children's recorded interviews under the provisions of Alaska Evidence Rule 801(d)(3). Evidence Rule 801 defines what evidence is hearsay, and section (d)(3) of this rule declares that the recorded pre-trial statement of a crime victim is exempted from the hearsay rule if the victim is under 16 years old and if the statement was taken under circumstances that satisfy the eight criteria listed in subsections (d)(3)(A) – (H).

Most of the eight listed criteria concern factual issues, such as whether the interview with the victim was conducted before the proceeding, and whether the victim's statement was recorded in a format that preserves both the audio and video components of the statement. But two of the criteria — (d)(3)(F) and (d)(3)(H) — explicitly require the trial judge to exercise judgement after evaluating the entirety of the circumstances surrounding the victim's statement.

Under subsection (d)(3)(F), the State must prove that "the taking of the statement as a whole was conducted in a manner that would avoid undue influence [on] the victim". And under subsection (d)(3)(H), the judge must additionally "determine that it is sufficiently reliable and trustworthy", and that "the interests of justice are best served by admitting the recording [of the statement] into evidence."

In the present case, we conclude that the trial judge failed to hold the State to its burden of proof under subsection (d)(3)(F), and that the trial judge failed to fulfill his role as evidentiary gatekeeper under subsection (d)(3)(H). We therefore remand this case to the superior court for reconsideration of whether the children's out-of-court statements should have been admitted.

Alaska Evidence Rules 801 and 802 contain the basic rules governing hearsay evidence. As defined by the combination of sections (a), (b), and (c) of Evidence Rule 801, "hearsay" evidence is any evidence that a person has made an assertion outside of court (*i.e.*, other than while testifying at the current trial or hearing), if the evidence of this assertion is being offered to prove that the assertion is true.

Under Evidence Rule 802, hearsay evidence is not admissible unless there is a provision of law that expressly authorizes its admission.

The concluding section of Evidence Rule 801 — section (d) — is such a provision. Evidence Rule 801(d) contains a list of certain types of evidence that are excluded from the definition of "hearsay", even though the evidence fits the definition of hearsay found in sections (a), (b), and (c) of the rule.

The present appeal focuses on one of these exceptions — the one codified in Evidence Rule 801(d)(3).

Evidence Rule 801(d)(3) authorizes the admission of certain out-of-court statements made by children who are alleged to be the victims of a crime. More specifically, Rule 801(d)(3) provides that a child's out-of-court statement can be admitted into evidence if the child is less than 16 years of age, if the statement was recorded, and if the proponent of the evidence establishes the following foundational matters:

> (A) the recording was made before the proceeding [at which it is being offered];

> (B) the victim is available for cross-examination;

> (C) the prosecutor and any attorney representing the defendant were not present when the statement was taken;

(D) the recording is on videotape or other format that records both the visual and aural components of the statement;

(E) each person who participated in the taking of the statement is identified on the recording;

(F) the taking of the statement as a whole was conducted in a manner that would avoid undue influence of the victim;

(G) the defense has been provided a reasonable opportunity to view the recording before the proceeding; and

(H) the court has had an opportunity to view the recording and determine that it is sufficiently reliable and trustworthy and that the interests of justice are best served by admitting the recording into evidence.

In this appeal, we are required to interpret a trial judge's duties under subsections (F) and (H) of this rule.

*Underlying facts*

In February 2012, seven-year-old M.Y. was in school, working on an art project. She told a teacher's aide that she was making the project for her mother and her grandmother, but not for her grandfather (*i.e.*, Augustine). M.Y. then asked the teacher's aide, "Do you know why I don't want to make this [project] for my grandpa?" — and, when the aide remained silent, M.Y. answered her own question, "Because my grandpa touches me."

The teacher's aide reported this conversation to M.Y.'s teacher, who in turn reported the conversation to the school counselor, Karin Gillis. Gillis interviewed M.Y.,

and during this interview M.Y. told Gillis (by pointing to a picture) that her grandfather had touched her genitals.

Gillis reported this matter to the Office of Children's Services, and the Office of Children's Services notified the State Troopers. Investigator Yvonne Howell was assigned to the case.

Investigator Howell contacted M.Y.'s mother, Tonia Clah, and told her about the report of possible sexual abuse. This was the first time that Clah heard of these allegations. Clah told Howell that M.Y.'s "grandpa" was Augustine (and that Augustine was not M.Y.'s biological grandfather, but rather the stepfather of Clah's husband).

Howell asked Clah not to speak to Augustine about these allegations until Howell had conducted further investigation. However, Howell did not ask Clah to refrain from speaking to her daughter.

That night, Clah sat down with M.Y. and questioned her. Clah warned M.Y. that she could not lie about what had happened between her and her grandfather — because, if she did, God would put a "hex" on her.

M.Y. initially told her mother that it was "supposed to be a secret." But, according to Clah, M.Y. finally told her, "Grandpa touched me." Clah testified that M.Y. used her middle finger to touch her genitals, and she said, "Mom, like that."

M.Y. had a younger sister, five-year-old T.Y. Clah did not speak to T.Y. directly about her older sister's allegations. But both M.Y. and T.Y. overheard a phone conversation in which Clah discussed the possibility that Augustine was going to go to jail. When M.Y. and T.Y. asked their mother about this conversation, Clah told them that she wanted to lock up Augustine and "throw away the key". And she told her daughters that she was going to try to find "justice" for them.

Apparently as a result of this conversation, M.Y. told Karin Gillis (the school counselor) that her grandfather was going to jail.

On February 15, 2012, Investigator Howell interviewed Clah and her husband. During this interview, Howell learned that T.Y. had said things to Clah which suggested that Augustine might have sexually abused T.Y. as well.

Investigator Howell then conducted separate, video-recorded interviews of M.Y. and T.Y. She interviewed each girl twice: on February 15th, and again on February 16th.

Investigator Howell's recorded interviews of the two children were admitted at Augustine's trial under Evidence Rule 801(d)(3). The State also presented the testimony of the other adults who heard the children speak about the alleged abuse. But the State did not call either of the children to testify.

The older of the two children, M.Y., testified briefly at Augustine's trial after the defense attorney asked to "cross-examine" her (even though she had given no testimony on direct examination). [1] The defense attorney asked M.Y. only a few questions of substance, and, in each instance, M.Y.'s answers to these questions were not incriminating to Augustine. After M.Y. gave this testimony, the defense attorney told the court that he did not wish to call T.Y. to the stand.

Thus, the State's case against Augustine rested almost exclusively on the out-of-court statements made by the two children, introduced through the testimony of adults.

---

[1]  The transcript of Augustine's trial erroneously states that M.Y. was "called as a witness on behalf of the plaintiff". M.Y. was called to the stand during the State's case, but the prosecutor did not conduct any direct examination of M.Y. Instead, M.Y.'s testimony began with cross-examination by the defense attorney, followed by a short "redirect" examination conducted by the prosecutor. This redirect examination consisted of only two questions: The prosecutor asked M.Y. how many televisions were at her grandfather's house, and where those televisions were located.

*The litigation over the admissibility of the four out-of-court interviews conducted by Investigator Howell*

On December 13, 2012 — about three weeks before Augustine's trial was scheduled to begin — the State filed a motion seeking the trial court's permission to introduce Investigator Howell's four recorded interviews of the children pursuant to Evidence Rule 801(d)(3). Five days later, Augustine's attorney filed an opposition to the State's motion.

But for practical purposes, the litigation of this issue had already begun five months earlier — when Augustine's attorney filed a notice that he intended to call Dr. John C. Yuille, a forensic psychologist, to testify at Augustine's trial about potential problems with the way in which Investigator Howell interviewed M.Y. and T.Y., and the potential unreliability of the children's statements during those interviews.

After the defense attorney notified the court and the State that he intended to call Dr. Yuille as an expert witness, the State objected that the defense attorney had not yet provided the State with a written description of the substance of Dr. Yuille's proposed testimony — his opinion, and the underlying basis of that opinion — as required by Alaska Criminal Rule 16(c)(4). In response to the State's objection, the defense attorney filed a copy of Dr. Yuille's nine-page written report.

We are about to describe Dr. Yuille's report in some detail. Our presentation of these details is not intended as an endorsement of Dr. Yuille's analytical approach or his conclusions. Rather, our aim is to demonstrate that the defense offered substantive reasons to doubt the reliability of M.Y.'s and T.Y.'s statements to Investigator Howell.

In his report, Dr. Yuille offered his views on the general principles that an investigator must be aware of, and adhere to, when conducting an investigative interview of a child, so as to "maximize the information obtained from the child while minimizing

the contamination of the child's memory". Under these principles, an interviewer should (1) avoid leading questions, (2) allow children to take their time and describe things in their own words, (3) obtain as much independent information as possible, to give the interviewer an objective basis for assessing the credibility of the child's account, and (4) avoid going into the interview with only one working hypothesis, an approach that can "blind" the interviewer to other relevant information that the child may have.

Dr. Yuille's report explained that he and his colleagues (from Europe and the United States) had developed a set of two dozen criteria for evaluating a child's statement about alleged abuse — more specifically, for evaluating whether it is likely that the child's assertions and descriptions are based on memories of real experiences, rather than things the child has "only imagined or heard about."

According to Dr. Yuille, any investigative interview of a child should be evaluated according to the presence or absence of these twenty-four criteria. But among the twenty-four, five criteria are critical, in the sense that all five usually should be present if the child is indeed describing real experiences. According to Dr. Yuille, the five primary criteria are: (1) the allegation should be of a coherent event, (2) the child should describe this event in a spontaneous fashion, (3) the child's description should have the quantity and quality of detail one would expect from this particular child, and, if the child has reached school age, (4) the child's allegation should include an age-appropriate sense of time and space, and (5) it should include age-appropriate descriptions of the child's interactions with the perpetrator.

In addition to describing this general approach to conducting investigative interviews of children, Dr. Yuille also offered an evaluation of Investigator Howell's interviews with M.Y. and T.Y. In his introduction to this critique, Dr. Yuille explained that he did not intend his remarks to be "viewed as a criticism of the officer", but rather

– 8 –                                                                 2464

a criticism "of the organization that did not provide [her with] the appropriate training to perform this type of interview."

According to Dr. Yuille, the four interviews in question (the two interviews of M.Y. and the two interviews of T.Y.) were of "uniformly of poor quality". Dr. Yuille noted that the interviews were "characterized by the use of leading questions [and] multiple choice questions." Based on the content of Howell's questions, Dr. Yuille characterized the interviews as "attempts to prove what the interviewer [already] believed had happened", rather than open-ended investigative efforts.

Dr. Yuille then criticized several of the interviewing techniques that Howell used when she interviewed the children:

- Howell allowed the children to draw throughout the interviews. According to Dr. Yuille, "[d]rawing is a distracting activity and it interferes with effective interviewing."

- Many of Howell's questions were "multiple-choice" questions — questions that offered the children a selection of answers. According to Dr. Yuille, a person who conducts an investigative interview of a child must avoid multiple-choice questions because "children ... will typically guess one of the alternatives even if they have no memory." This means that a child's answers to such questions are "often unreliable".

- Howell repeatedly used leading questions during all four interviews, making it "impossible to tell" whether the child's answers were reliable or were, instead, "a result of the leading nature of the question."

  (Dr. Yuille listed these examples of leading questions that Howell asked the children: "Did he tell you not to tell?"; "Did you say anything?"; "Are there any spots on his penis?")

- Dr. Yuille also pointed out that, in response to Howell's leading questions during her interview with T.Y. on February 15th, the girl gave inconsistent descriptions of the same event: When Howell asked T.Y., "Did you go?", T.Y. replied, "Yes." But a little later, when Howell phrased the question as, "Did he make you stay?", T.Y. replied that Augustine made her stay.

- Based on the tenor of Howell's questions as a whole, Dr. Yuille concluded that the four interviews "were driven by a single hypothesis" — the theory that Augustine had committed an offense. According to Dr. Yuille, "[t]he biggest single impediment to effective investigation is interviewer bias" — not bias in the sense of personal enmity or prejudice, but rather in the sense that the interviewer is attempting "to prove a particular hypothesis rather than [conduct] an investigation to determine what may or may not have happened."

In his concluding paragraph, Dr. Yuille summed up his evaluation of the interviews with the following observations:

> Four poor quality interviews were conducted with these two children. No attempt was made to determine what may or may not have happened in this case: the interviews were intended to prove that the suspect had offended against these children. The biased interviews were characterized by leading questions and multiple choice questions. Little information was obtained from the children[,] and what was obtained was of questionable reliability. Proper, effective, non-leading interviews of these children are needed to determine what, if anything, may have happened in this case. At present, an assessment of the credibility of the allegations is impossible.

Five months later, when the State formally sought admission of Howell's four interviews with the children, the defense attorney's opposition to this evidence rested heavily on the conclusions that Dr. Yuille reached in his report.

In the defense attorney's opposition to the State's motion, he echoed four of Dr. Yuille's primary criticisms of the way that Investigator Howell handled the interviews. The defense attorney argued that Howell had undermined the reliability of the interviews by: (1) asking leading questions; (2) asking multiple-choice questions or compound questions; (3) asking questions which suggested that Howell already believed the accusations against Augustine, and that she was looking for answers that would support those accusations; and (4) allowing the girls to distract themselves by drawing pictures throughout the interviews.

In addition, the defense attorney argued that the girls' statements had been influenced by their mother's pre-interview actions and conversations, which he characterized as both "inflammatory" and "suggestive".

Based on all of the above, the defense attorney argued that the State had failed to satisfy the criteria for admissibility specified in Evidence Rule 801(d)(3). In particular, the defense attorney contended that the interviews failed to satisfy subsection (d)(3)(F), which requires the State to prove that "the taking of the statement as a whole was conducted in a manner that would avoid undue influence [on] the victim".

But over the defense attorney's objections, the trial judge ruled that the recorded statements of the two children met the requirements of Evidence Rule 801(d)(3), and that those out-of-court statements were therefore admissible.

The judge made no findings on the factual contentions raised by the defense attorney, or on the criticisms raised in Dr. Yuille's report. Instead, the judge simply recited all of the defense attorney's concerns, and then the judge declared:

> All of the issues raised by the defense go to the weight to be given the evidence[,] and [those issues] can be addressed through cross-examination or by otherwise impeaching the [out-of-court] statements. The defense can cross-examine the children's mother regarding [the] statements she made to the children [before the interviews]. The defense can cross-examine the children. The defense can also cross-examine Investigator Howell regarding [the] methods [she] used in the interviews.

The judge then stated, without further elaboration, that he was granting the State's motion to admit the four interviews under Evidence Rule 801(d)(3).

*A trial judge's duty under Evidence Rule 801(d)(3)*

In a jury trial, it is the jury's task to determine the ultimate weight or credibility of the evidence presented. But if there is a controversy as to whether particular evidence is admissible, it is the trial judge who must resolve that controversy. [2]

This same division of authority applies even in instances where the admissibility of particular evidence hinges on a foundational showing that the evidence is reliable or trustworthy.

For instance, in cases that depend on eyewitness identification, if the defendant objects that the identification procedure was unduly suggestive, the State must establish that the witness's identification is reliable. [3] Or in cases where the defendant wishes to introduce someone else's out-of-court confession to the crime, the defendant

---

[2]   *See* Alaska Evidence Rule 104(a).

[3]   *See Tegoseak v. State*, 221 P.3d 345, 353-54 (Alaska App. 2009).

must establish that "corroborating circumstances clearly indicate the trustworthiness of the [other person's] statement." [4]

In such instances, *both* the judge and the jury will be assessing the reliability or trustworthiness of the evidence. The judge performs this analysis first, when the judge decides whether the evidence is admissible at all. If the judge rules that the evidence is admissible, the party who opposed the admission of the evidence is still free to argue to the jury that the evidence is unreliable or not credible.

These same principles apply when the State invokes Evidence Rule 801(d)(3) as a means of introducing evidence of a child's out-of-court statements concerning a crime.

As the proponent of this evidence, the State must establish the eight foundational requirements codified in subsections (A) – (H) of Evidence Rule 801(d)(3). And two of these foundational requirements involve assessments of the reliability or trustworthiness of the child's out-of-court statement.

Under subsection (F), the State must prove that "the taking of the statement as a whole was conducted in a manner that would avoid undue influence [on] the victim". And under subsection (H), the judge must additionally determine that the child's statement is "sufficiently reliable and trustworthy", and that "the interests of justice are best served by admitting the recording [of the statement] into evidence."

(We acknowledge that the wording of subsection (H) is ambiguous, and that it could arguably be read to mean that the judge should assess whether the *recording* of the statement is "sufficiently reliable and trustworthy" — in the sense that the recording accurately *depicts the taking* of the child's statement, without regard to the larger question of whether the statement itself is reliable and trustworthy. Here is the pertinent language:

---

[4] Alaska Evidence Rule 804(b)(3).

(H) the court has had an opportunity to view the recording and determine that it is sufficiently reliable and trustworthy and that the interests of justice are best served by admitting the recording into evidence.

But as we are about to explain in some detail, the legislative history of Evidence Rule 801(d)(3) demonstrates that the primary goal of subsection (H) is to have the trial judge assess the reliability and trustworthiness of the child's *statement*, not the aural and visual accuracy of the recording.)

In Augustine's case, the defense attorney raised questions as to whether the children had been subjected to undue influence, either by their mother (before the interviews), or by the interviewer herself, due to her method of questioning. And, relying on Dr. Yuille's conclusions, the defense attorney raised broader questions concerning the reliability and trustworthiness of the statements elicited from the children during the interviews.

But the trial judge made no findings regarding these concerns, and the judge's written decision does not reflect that the judge engaged in any independent analysis of the issues raised by the defense attorney. Instead, the judge simply noted these concerns and then declared that these matters were for the jury.

The judge's approach to this issue was inconsistent with his duty under Evidence Rule 104(a) — the duty to determine, before admitting the evidence, that the State had satisfied the foundational requirements specified in Evidence Rule 801(d)(3). Moreover, as we are about to explain, the judge's ruling was inconsistent with the role that was envisioned for trial judges by the legislators who drafted Evidence Rule 801(d)(3).

*(a) The legislative history of Alaska Evidence Rule 801(d)(3)*

Alaska Evidence Rule 801(d)(3) was enacted by the legislature, not by the Alaska Supreme Court. [5]

The original version of Evidence Rule 801(d)(3) was introduced as Senate Bill 117 (24th Legislature) at the end of February 2005. [6] The chief sponsor of this bill was Senator Hollis French.

In the original version of the bill, the new hearsay exception was going to be codified in a completely new evidence rule, Rule 413. And the two subsections at issue in this appeal — subsections (F) and (H) — were originally labeled subsections (6) and (8):

> (6) the taking of the statement as a whole was conducted in a manner that would avoid undue influence of the victim;
>
> . . .
>
> (8) the court has viewed the recording and has determined that it is sufficiently reliable and trustworthy and that the interests of justice are best served by admitting the recording into evidence.

(This text is available at http://www.akleg.gov/PDF/24/Bills/SB0117A.pdf.)

The Senate Judiciary Committee ultimately decided to insert the new provision into existing Evidence Rule 801(d) (the rule defining hearsay), rather than to

---

[5]   *See* Article IV, Section 15 of the Alaska Constitution, which grants the legislature the authority to amend the rules of court.

[6]   *See* 2005 Senate Journal 413-14.

create a whole new evidence rule.[7] Because of the Committee's decision, the subsections of the rule became labeled with letters rather than numbers. Thus, subsection (6) became subsection (F), and subsection (8) became subsection (H).

When Senator French introduced his bill to the Senate Judiciary Committee on March 31, 2005, he told the Committee that the purpose of the bill was to guarantee that the out-of-court statements of younger crime victims would be admissible if the statements were elicited under certain specific conditions. When describing the specific conditions he envisioned, Senator French told the Committee that all of these forensic interviews

> [would be] conducted at safe, nurturing child-friendly environments [by] interviewers ... specially trained to work with children, and work with a multi-disciplinary team focused on the child's welfare. The team may include police officers, social workers, child therapists, medical professionals, and child advocates.

Senator French added that, by "centralizing" the child's dealings with adults in positions of authority at a child advocacy center, a child crime victim could be made to feel "safer and more confident". And, according to Senator French, changing the law to authorize the admission of recorded statements made by children in such environments "[would] enhance the law enforcement process to bring child predators to justice." The senator explained:

> A statement made by a child in an environment that is focused on the child's welfare and comfort is often much more informative about the child's experience with an abuser than the testimony the child will give in a formal court

---

[7] *See* CSSB 117 (Judiciary) (24th Legislature). The text of this second version is available at http://www.akleg.gov/PDF/24/Bills/SB0117B.PDF.

setting. Children express things differently, and they often need to explain what has happened to them using physical objects, rather than words. Children are, understandably, intimidated by formal questioning by unfamiliar adults in a courtroom setting. [And] their difficulty in articulating the details of a very painful and very private experience often results in a reduction of the charges.

Thus, Senator French explained, the "basic idea behind the bill" was to make sure that a child's pre-trial interview about the alleged crime would be admissible at the defendant's trial as long as certain conditions were satisfied.

When describing "the conditions that must be satisfied", Senator French spoke of the need to have a child "interviewed by someone who's really skilled at talking to children and slowly letting them tell their own story, in their own words, without leading the child ... to an incriminating statement" — because "[k]ids are obviously easily led, and it's real important that you not put words in their mouths, [that] you let them tell their own story."

A little later in the hearing, Senator French elaborated on this requirement:

One of the concerns [in this area] are some of the horror stories [from] the early days of child sex abuse prosecutions, when you had folks really taking kids by the nose and getting [them to make] some astonishingly awf[ul], untruthful statements, as it turns out, ... and convicting folks on the basis of [those false statements]. ... And that's why ... section (F) is so important — which is that the taking of the statement, as a whole, is conducted in a manner that would avoid undue influence of the victim.

And the folks who take these [statements] for a living will tell you how important it is to ask open-ended questions, and not put words in [a] kid's mouth. And, [under the proposed law], the judge has to have looked at this statement

before it's admitted, and — [or] had the opportunity to look at it; we're going to talk about changing that wording a little bit — to make certain that it is trustworthy. So we're not convicting people based on, you know, fairy tales.

In these comments and explanations, Senator French was directly addressing the requirement codified in subsection (F) of Evidence Rule 801(d)(3): the requirement that the child be interviewed "in a manner that would avoid undue influence of the [child]". But Senator French's comments and explanations were also relevant to the requirement codified in subsection (H) of the rule: the duty of the court to assess whether the child's statement "is sufficiently reliable and trustworthy", and "that the interests of justice are best served by admitting the recording [of the statement] into evidence."

We have already quoted the original language of subsection (H). In its original form, this subsection declared that the recording of a child's pre-trial interview would not be admissible until the trial judge had "viewed the recording" and had determined that the child's out-of-court statement was "sufficiently reliable and trustworthy".

But at the Judiciary Committee hearing, Senator French explained that the Department of Law's representative had come up with "a good suggestion" that would ease this burden on trial judges. Rather than requiring trial judges to personally view the video recording in every case where the State invoked Evidence Rule 801(d)(3), Senator French and the representative of the Department of Law suggested that subsection (H) of the rule be amended to require only that the trial judge have "*the opportunity to view the recording*". (Emphasis added.)

When one of the committee members asked how a judge could possibly determine that an out-of-court statement was "sufficiently reliable and trustworthy" to be admitted into evidence if the judge hadn't personally reviewed the video recording

of the statement, Senator French answered that his point was to exempt judges from having to review the recording if the defense attorney made no objection to the admission of the statement. Senator French conceded that, if the defense attorney *did* object, the trial judge "probably is going to have to look at [the recording]."

Another committee member, Senator Therriault, immediately endorsed this view of the trial judge's responsibilities. He declared that if the defense attorney objected to the admission of the child's statement, "the judge would be forced ... to view the tape and see if the challenge [was] valid."

The chair of the Committee, Senator Seekins, also endorsed the view that judges would be required to actively review the recording of the child's statement if the admissibility of the child's statement was challenged. Senator Seekins told Senator French that he had no problem with exempting judges from reviewing the video recordings in cases where "[it is] certain that there has been no motion to suppress". But in cases where the defense does object to the admission of the out-of-court statement, Senator Seekins reiterated the view that trial judges should have the affirmative responsibility to review the tape before deciding whether to allow the introduction of this evidence. Senator French responded, "I think that [this responsibility] would be unavoidable."

With these clarifying remarks, the Judiciary Committee endorsed the proposed amendment of subsection (H) — thus putting subsection (H) in its present form.

Thus, under subsections (F) and (H) of Evidence Rule 801(d)(3), trial judges are required (1) to affirmatively determine that the child's statement was elicited in a neutral and non-leading manner, and (2) to independently evaluate the reliability and trustworthiness of the statement if it is challenged. These duties are critically important because of Senator French's other major goal: to exempt the child from having to take

2464

the stand at the defendant's trial, and to allow the State to pursue the sexual abuse charges based solely on the child's out-of-court statement, unless the defense attorney expressly invokes the defendant's right to cross-examine the child:

> *Senator French*: [P]robably the most crucial aspect of the bill is [the] provision ... that says "the victim [must be] present at the proceeding and available to testify." I think the bill would be unconstitutional without that provision, so it's important that the victim be available to be cross-examined on the statement that he or she made back at the [child advocacy center].
>
> .  .  .
>
> *Senator Therriault*: ... [Y]ou've got here, "available to testify". [Does] this wording ... mean [that the child] would have to actually sit up there [on the stand] and go through [their] halting [testimony] in order for the videotape [of the child's prior statement] to be shown?
>
> *Senator French*: ... [T]hat's certainly not my intent. My intent is that [a] prosecutor could be asked to call his next witness, and [the prosecutor would] say, "My next witness is going to be ... the person who took this statement from the child, and we're going to play the [child's out-of-court] statement." And let the defense call the victim to the stand to cross-examine, if they choose.

A little later in the hearing, Senator Seekins asked a representative of the Department of Law if, under the proposed statute, the video recording of the child's pre-trial interview "would be the direct testimony of the child", and if the child would only need to be physically present in court "[as] necessary for cross-examination, or [for] expansion of the testimony that was already on the [video] tape". The Department of Law's representative replied, "I think that [what you just described] would, in practice, be what would happen."

*(b) Our interpretation of Evidence Rule 801(d)(3)(F) and (H)*

As we noted earlier, when the admissibility of particular evidence is called into question, Evidence Rule 104(a) requires trial judges to determine whether the proponent of the evidence has satisfied the foundational requirements for its admission. And as we have just explained in the preceding section of this opinion, the legislative history of Evidence Rule 801(d)(3) confirms that a trial judge has this same duty when the State wishes to introduce the video recording of a child's out-of-court statement under Rule 801(d)(3).

In cases where the defense objects to the admission of a child's out-of-court statement under Evidence Rule 801(d)(3), a trial judge (1) must independently review the video recording of the child's statement, and (2) must determine whether the State has satisfied the foundational requirements of subsections (A) through (H) — and, in particular, the requirements of subsections (F) and (H).

Thus, before the trial judge admits the video recording, the State must prove — *i.e.*, the trial judge must affirmatively find — that "the taking of the statement as a whole was conducted in a manner that would avoid undue influence [on] the victim", that the out-of-court statement "is sufficiently reliable and trustworthy", and that "the interests of justice are best served by admitting the recording into evidence."

*(c) Application of this law to Augustine's case*

In the present case, Augustine's attorney affirmatively objected to the admission of M.Y.'s and T.Y.'s recorded pre-trial statements, and the attorney offered articulable reasons for believing that the State had not met the foundational requirements of subsections (F) and (H) of Rule 801(d)(3).

But instead of resolving the foundational questions surrounding the children's out-of-court statements, Augustine's trial judge ruled that all of these questions were for the jury, and the judge directed the defense attorney to litigate these matters at trial. This was error. The judge was required to resolve these issues — and if the judge concluded that the State had failed to establish all of the foundational requirements of Rule 801(d)(3), the judge would be required to deny the State's motion to admit the evidence under that rule.

We wish to clarify that, even when a judge denies a motion to admit a child's out-of-court statements under Evidence Rule 801(d)(3), this does not mean that the child's out-of-court statements will necessarily be excluded from the trial.

Another section of Evidence Rule 801 — section (d)(1) — contains three subsections that would authorize the judge to admit some or all of the child's out-of-court statements. Subsection (d)(1)(A) of this rule allows a judge to admit a child's out-of-court statement if it is inconsistent with the child's testimony at trial. Subsection (d)(1)(B), allows a judge to admit a child's out-of-court statement if the child's testimony is attacked as fabricated or the product of improper influence or motive, and if the out-of-court statement is consistent with the child's testimony. And subsection (d)(1)(C) allows a judge to admit evidence of a child's out-of-court identification.

In addition, Evidence Rule 803 contains several hearsay exceptions that might potentially apply to a child's out-of-court statements.

But before the State can introduce a child's entire pre-trial interview without calling the child to the stand, the trial judge must be satisfied that the State has met all the requirements listed in Evidence Rule 801(d)(3).

Here, although the trial judge announced that all these requirements were met, he did not personally evaluate whether the State had satisfied requirements (F) and (H). Rather, he ruled that it was up to the jury to decide whether "the taking of the

statement as a whole was conducted in a manner that would avoid undue influence [on] the victim", and whether the statement was "sufficiently reliable and trustworthy".

The children's video-recorded statements were not admissible under Evidence Rule 801(d)(3) without judicial findings on these matters. We must therefore remand Augustine's case to the superior court, so that the judge can re-assess whether the State established a proper foundation for the admissibility of these statements.

As we explained earlier, Augustine's defense attorney raised questions as to whether the children were subjected to undue influence, either by their mother (before the interviews), or by Investigator Howell (during the interviews). And Dr. Yuille's report raised broader questions concerning the reliability and trustworthiness of the statements elicited from the children during the interviews, in light of Investigator Howell's interrogation techniques and her method of conducting the interviews.

But the trial judge made no findings regarding these concerns, and the judge's written decision does not reflect that the judge engaged in any independent analysis of the issues raised by the defense attorney. We therefore direct the superior court to resolve these matters.

We also note one further issue in this case — an issue arising from the fact that the person who conducted the pre-trial interviews was the same state trooper who had been assigned to investigate whether Augustine had sexually abused the children.

As we have explained, subsection (F) of Rule 801(d)(3) requires the State to prove that "the taking of the statement as a whole was conducted in a manner that would avoid undue influence of the victim".

When Senator French explained this requirement to the Senate Judiciary Committee, he told the Committee the proposed legislation was based on the underlying premise that the child's pre-trial interview would be "conducted at safe, nurturing child-friendly environments [by] interviewers ... specially trained to work with children".

According to Senator French, one of the important reasons for requiring a specially trained interviewer was that "[k]ids are obviously easily led, and it's real important that you not put words in their mouths, [that] you let them tell their own story", so that "we're not convicting people based on ... fairy tales." Senator French warned the Committee members about "the early days of child sex abuse prosecutions, when you had folks really taking kids by the nose and getting [them to make] some astonishingly awf[ul], untruthful statements."

This insistence that the interview be neutral and non-suggestive is written into a separate clause of Evidence Rule 801(d)(3). Under subsection (C) of the rule, the prosecutor and the defense attorney are forbidden from participating in the interview; indeed, they are prohibited from being present at all.

But if the attorneys representing the State and the defendant are barred from participating, so as to preserve the neutrality and non-suggestiveness of the interview, the participation of agents of those attorneys — their paralegals and their investigators — would seemingly raise the same concerns.

In Augustine's case, the two children were interviewed by the law enforcement officer who had the responsibility for investigating the reported crimes. Because Investigator Howell already knew about the children's prior statements when she conducted these interviews, there is a potential danger that the children's responses could have been influenced by Howell's knowledge and expectations — even though, outwardly, there was nothing suggestive about the interview procedure.

In *Tegoseak v. State*, 221 P.3d 345, 351-362 (Alaska App. 2009), we discussed how recent psychological research has shown that a witness's identification of a suspect can be influenced by the police interviewer's inadvertent, even unconscious, verbal and physical cues — cues that arise from the interviewer's pre-existing knowledge and theories of the case. Many of the factors that we discussed in *Tegoseak* are

– 24 –                    2464

potentially relevant to the assessment of whether the interviews in Augustine's case were truly the kind of neutral, non–suggestive interviews envisioned by the legislators who enacted Evidence Rule 801(d)(3).

We do not decide whether an interview conducted by the investigator assigned to the case is *per se* inadmissible under Evidence Rule 801(d)(3). But we direct the superior court to consider this factor in assessing whether the interviews in this case met the foundational requirements of Rule 801(d)(3)(F) and (H).

Compare *Davison v. State*, 282 P.3d 1262, 1269-1270 (Alaska 2012), where our supreme court held that a child's statements made during a medical examination were not admissible under Evidence Rule 803(4) (the hearsay exception for statements made for medical diagnosis or treatment) because the purpose of the examination appeared to be primarily forensic rather than medical. The supreme court noted that (1) a state trooper arranged for the examination, (2) the trooper met the child and her mother at the airport and drove them to the hospital for the exam, (3) the trooper and a women's advocate were present during the exam, and (4) the trooper took an active role in questioning the child, and prompted some of the child's responses. *Ibid.*

A final word on this topic: As we noted earlier, the State's case against Augustine rested almost exclusively on the children's out-of-court statements, and the video-recorded interviews conducted by Investigator Howell were the centerpiece of the State's case. For this reason, if the trial judge concludes that the State has failed to establish the required foundation under Evidence Rule 801(d)(3), Augustine's convictions must be reversed.

*The evidence presented at Augustine's trial was sufficient to support his conviction for sexual penetration of M.Y., but not his conviction for sexual penetration of T.Y.*

The jury found Augustine guilty of two counts of first-degree sexual abuse of a minor (for engaging in acts of sexual penetration with M.Y. and T.Y.) and two counts of second-degree sexual abuse of a minor (for engaging in acts of sexual contact with the two girls).

On appeal, Augustine argues that even if the video interviews of the children were properly admitted at his trial, the State's evidence was nevertheless legally insufficient to support the jury's verdicts on the two first-degree sexual abuse charges — the charges alleging sexual penetration.

Augustine points out that, during her out-of-court interviews, T.Y. never stated that Augustine's finger went inside her. Indeed, T.Y. expressly denied that digital penetration had occurred when she testified at the grand jury.

Augustine concedes that there was some evidence to support a finding of sexual penetration with respect to M.Y., but he argues that this evidence was so insubstantial that it could not support a finding of guilt beyond a reasonable doubt.

All of the State's evidence pertaining to sexual penetration was contained in the video recordings of Investigator Howell's pre-trial interviews of the two girls. The question on appeal is whether, viewing these videos (and the reasonable inferences to be drawn from them) in the light most favorable to upholding the jury's verdicts, reasonable jurors could conclude that the State had proved its allegations beyond a reasonable doubt. [8]

---

[8] *Moore v. State*, 298 P.3d 209, 217 (Alaska App. 2013).

*The evidence of sexual penetration regarding M.Y.*

During M.Y.'s first interview with Investigator Howell, M.Y. stated that Augustine had put his hand "underneath [her] panties", and she answered in the affirmative when Howell asked her whether Augustine's hand went inside her "tushy". This evidence, if believed, was sufficient to support a finding of sexual penetration beyond a reasonable doubt.

*The evidence of sexual penetration regarding T.Y.*

To evaluate whether the State's evidence was sufficient to establish a sexual penetration of T.Y., this Court reviewed the video recording of Investigator Howell's interview with T.Y. — the video that was played for the jury at Augustine's trial (Trial Exhibit No. 3). Based on our review of this video, we have inserted bracketed text at various places in the transcript to explain what T.Y. was doing, or how she was acting, when she gave her responses to Howell's questions.

Early in the interview, T.Y. stated that Augustine had touched her "butt" (*i.e.*, her genitals). Later in the interview (at two points), Howell asked T.Y. if it hurt when Augustine touched her "butt" with his finger; both times, T.Y. answered, "Yeah."

But when Howell asked T.Y. whether Augustine ever put his finger inside her body, T.Y. responded with a series of confusing, semi-coherent answers — answers that ultimately led Howell to abandon this line of questioning. Because T.Y. never gave a coherent answer to Howell's questions about sexual penetration, we conclude that the State's evidence was insufficient to convince reasonable jurors that the State had proved this element beyond a reasonable doubt.

*(a) A more detailed look at Investigator Howell's interview with T.Y.*

The video of the interview shows that Investigator Howell and T.Y. sat across a table from each other during the interview. T.Y. was sometimes visually focused on Howell, but T.Y. often turned her attention away from Howell (even while Howell was in the middle of asking her questions), either to use a spoon to eat noodles from a large cup, or to pick up drawing materials from the table and make drawings on the pad of paper in front of her.

About halfway through the interview, just before the segment of the interview that the State relies on as its proof of penetration, Investigator Howell spent several minutes asking T.Y. to identify parts of the body, using diagrams that the investigator placed in front of T.Y. on the table. Here is the portion of the conversation where Investigator Howell began to ask substantive questions:

> *Inv. Howell*: … And this [part of the body]?
>
> *T.Y.*: Arm. [misidentifying a leg]
>
> *Howell*: This part? [pointing to the same part again]
>
> *T.Y.*: I mean, leg.
>
> *Howell*: Leg. [And] what do you call that? [pointing to another part of the diagram]
>
> *T.Y.*: Foot.
>
> *Howell*: Foot. All right. See, I help — I understand you a little bit more, 'cause when you said your grandpa took your — tell me if I'm wrong, okay? You — Did you tell me that your grandpa took your hand and made you touch his elephant butt? [*i.e.*, his male genitals]

*T.Y.*:  No.

*Howell*:  You didn't tell me that?  Tell — tell me what happened.  If you want to point, you can.  But will you tell me again what you said?

*T.Y.*:  I just said.

*Howell*:  'Cause I don't remember.  I must — Thank you for telling me I got it wrong.

*T.Y.*:  You said —  [pause; T.Y. turns away from Howell]  Can I color?  [This was said in a higher pitched voice, as in "Can I color now instead?"]

*Howell*:  Can you color?

*T.Y.*:  Yeah.

*Howell*:  Yeah.  What do you want to — what — you mean color over there [on the pad of drawing paper mounted on the wall]?  Or color right here [on the pad in front of you]?  I can give you some more paper.

*T.Y.*:  Color right here.

*Howell*:  Okay.  Yeah, you bet.  Go for it.  You can color.

*T.Y.*:  With these.  [T.Y. picks up a box of markers or drawing pencils.]

*Howell*:  Want to use those?  We're gonna talk while you color, though, okay?  So — 'cause I want to make sure I understand just — I have some questions for you.

At this point in the interview, Investigator Howell asked T.Y. a series of questions designed to elicit the girl's statements regarding potential acts of sexual contact and sexual penetration. T.Y.'s responses were fairly comprehensible when she described sexual touching, but her responses were confusing when Investigator Howell tried to elicit statements from T.Y. about sexual penetration. Throughout the following portion of the interview, T.Y. was fidgeting with a marker in her hand:

*Howell*: So what — What did you tell me ... about your grandpa? You said you didn't — you didn't like it when your grandpa ...

*T.Y.*: Well, he likes to touch my elephant butt. [Again, this was T.Y.'s name for the male genitals.]

*Howell*: He likes to touch *your* elephant butt?

*T.Y.*: He — he likes to touch my butt.

*Howell*: He likes to touch your butt. Will you show me on this picture which — what you mean by that? What part of your body does he touch?

[T.Y. points to the diagram of the body that is on the table in front of Howell.]

*Howell*: That part? [T.Y. then points to a different portion of the diagram.] And that part? Okay. When he touches this part of your body, does he — what does he touch it with?

*T.Y.*: With his finger.

*Howell*: With his finger? Does it hurt?

*T.Y.*: Yeah.

*Howell*: Does the — does he put his finger inside of your body, [or] outside of your body, or something else?

*T.Y.*: He put something else in my body.

*Howell*: He put something else in your body?

*T.Y.*: Yeah, and so — so (indiscernible) wipe it off.

*Howell*: Okay, he — he put — What else did he put inside your body that you wiped off?

*T.Y.*: He put a diaper in my body. [T.Y. picks up a second marker with her other hand.]

Howell: He put a diaper in your body? I don't understand. Will you help me understand?

*T.Y.*: Yes. [T.Y. starts rolling this second marker back and forth across the pad of paper in front of her.]

*Howell*: Okay. What — what do you mean by that?

*T.Y.*: [My grandpa] put the diaper on me. [T.Y. begins picking up the markers in front of her.]

*Howell*: He put a diaper on you?

*T.Y.*: Yeah.

*Howell*: Okay. Did — did something go inside of this part of your body?

*T.Y.*: Yes. [T.Y. puts the second marker down.]

*Howell*: What went inside of this part of your body?

2464

*T.Y.*:  Food.

*Howell*:  Food went inside?  [Using the first marker, T.Y. begins drawing a large circle on the pad of paper in front of her.]  I see.  What are you gonna draw a picture of?

*T.Y.*:  Earth.

*Howell*:  Earth?  What's gonna be inside the Earth?

*T.Y.*:  Planets.

*Howell*:  Planets.  Are you gonna draw your house?

*T.Y.*:  Yes, like some — like — spaceship coming to it.

After T.Y. gave these responses, Howell pursued the interview for another 18 minutes — but during these 18 minutes, Howell never asked T.Y. another question to clarify the issue of sexual penetration.

*(b) Why we conclude that this evidence is insufficient to establish penetration beyond a reasonable doubt*

At trial, when the prosecutor delivered her summation to the jury, she argued that T.Y.'s responses to Howell (the responses we have just quoted) were sufficient to establish that Augustine sexually penetrated T.Y.  Specifically, the prosecutor asserted that the element of penetration was established by T.Y.'s statement that it hurt her when Augustine touched her genitals.

But in her argument to the jury, the prosecutor mischaracterized T.Y.'s statement on this subject:  the prosecutor told the jurors that T.Y. had said that it hurt *when Augustine put his finger inside her* — and the prosecutor suggested that T.Y. felt

– 32 –

2464

this pain because Augustine's finger was pressing against her hymenal opening (a structure at the entrance to the vaginal canal). In fact, T.Y. never said that Augustine put his finger — or anything else — inside her body.

On appeal, the State does not repeat the prosecutor's mistaken assertion. Instead, the State simply argues that, because T.Y. said that it hurt when Augustine touched her, the jurors could reasonably infer that this touching was internal rather than external.

But given T.Y.'s answers as a whole, the State's suggested inference is no more than speculative.

Over the entire course of the interview (which lasted nearly 40 minutes), T.Y. never said that Augustine penetrated her — even though Investigator Howell asked T.Y. a series of questions that were obviously designed to elicit this information. T.Y.'s answers to Howell's inquiries on this point were so incomprehensible that Howell finally gave up — never returning to this subject even though the interview lasted for another 18 minutes.

The question is whether the State's evidence, if believed, was sufficient to convince reasonable jurors that the State had proved its allegation of penetration beyond a reasonable doubt.

Normally, if the jury finds that the State's evidence is credible, it will inevitably follow that the jury could reasonably conclude that the State had proved its case beyond a reasonable doubt. But there are occasional cases where, even if the jury finds the State's evidence credible, that evidence is still so nebulous, confused, or speculative that it is not sufficient to support a reasonable conclusion that the government has proved the defendant's guilt beyond a reasonable doubt.

For instance, in *People v. Trevino*, 704 P.2d 719, 217 Cal.Rptr. 652 (Cal. 1985), the central issue at trial was identity, and the government's case against the

defendant rested on "[a] solitary fingerprint of unknown vintage", coupled with "highly speculative and equivocal identification testimony". *Id.*, 704 P.2d at 737; 217 Cal.Rptr. at 670. The California Supreme Court declared that this evidence was not sufficient to warrant a reasonable juror in concluding that the defendant's guilt had been proved beyond a reasonable doubt — and the court therefore ruled that the defendant was entitled to a judgement of acquittal. *Ibid.*

Similarly, in *People v. Giuliano*, 482 N.E.2d 557, 492 N.Y.S.2d 939 (N.Y. 1985), the New York Court of Appeals concluded that, in order to return a guilty verdict, "a trier of fact would have had to engage in speculation, draw unwarranted conclusions based on probabilities of low degree, and leap logical gaps in the evidence." *Id.*, 482 N.E.2d at 560, 492 N.Y.S.2d at 942. The court concluded that "no rational trier of fact could have found that [the] elements of the crime were established beyond a reasonable doubt," and the court vacated the defendant's conviction. *Ibid.*

We reach the same conclusion here. We presume that the jury found T.Y.'s out-of-court statements to be fully credible, and we acknowledge that the jury was entitled to interpret T.Y.'s statements in light of the evidence that Augustine sexually penetrated her sister, M.Y. (evidence that *was* legally sufficient to establish penetration).

Nevertheless, even when viewed in the light most favorable to the verdict, the evidence that Augustine penetrated T.Y. remains so speculative and equivocal that it is legally insufficient to support a finding of sexual penetration beyond a reasonable doubt.

We therefore reverse Augustine's conviction for first-degree sexual abuse of a minor involving T.Y. (We uphold Augustine's conviction for second-degree sexual abuse of a minor involving T.Y., because that conviction requires proof of sexual contact, not sexual penetration.)

*Augustine's sentence must be vacated*

Augustine was found guilty of two counts of first-degree sexual abuse of a minor (for acts of sexual penetration) and two counts of second-degree sexual abuse of a minor (for acts of sexual contact). Because of his two prior sexual felony convictions, Augustine faced a presumptive term of 99 years' imprisonment on each count.[9] The superior court imposed a 99-year sentence on each of the four counts, and the court ordered these sentences to run consecutively, for a composite term of 396 years.

Both Augustine and the State agree that the sentencing judge imposed this sentence based on a misunderstanding of the applicable law governing consecutive versus concurrent sentences. The judge mistakenly thought that Augustine's sentences had to be totally consecutive. In fact, under AS 12.55.127(c)(2)(E) and (F), the majority of Augustine's sentences could be concurrent.

Augustine was being sentenced for two counts of first-degree sexual abuse of a minor and two counts of second-degree sexual abuse of a minor. Under AS 12.55.127(c)(2), the judge was required to impose the full 99-year presumptive term for one of Augustine's first-degree sexual abuse convictions. But the statute required only partially consecutive sentences for Augustine's other three convictions.

With regard to Augustine's conviction on the other count of first-degree sexual abuse, only one-fourth of Augustine's 99-year sentence — 24 years, 9 months — had to be consecutive. *See* AS 12.55.127(c)(2)(E). And with regard to Augustine's two convictions for second-degree sexual abuse, only one day of these two sentences had to be consecutive. *See* AS 12.55.127(c)(2)(F), as interpreted in *Scholes v. State*, 274 P.3d 496, 500 (Alaska App. 2012).

---

[9] *See* AS 12.55.125(i)(1)(F) and AS 12.55.125(i)(3)(E).

In other words, the minimum composite sentence that Augustine could receive was not 396 years (as the sentencing judge mistakenly believed), but rather 123 years, 9 months, and 2 days.

Moreover, because we have reversed one of Augustine's convictions for first-degree sexual abuse, Augustine's minimum composite sentence is now 99 years and 2 days.

We therefore remand this case to the superior court for a re-assessment of how much of Augustine's sentences should run consecutively.

*Conclusion*

We conclude that the evidence supports Augustine's conviction for first-degree sexual abuse of M.Y., but the evidence does not support Augustine's conviction for first-degree sexual abuse of T.Y., and that conviction must be reversed.

With regard to the admissibility of the children's four out-of-court interviews under Evidence Rule 801(d)(3), we direct the superior court to re-assess the admissibility of this evidence in light of our discussion in this opinion — and we direct the court to grant Augustine a new trial if the State fails to establish the foundational requirements for the admission of this evidence.

And, as we have explained, even if this evidence remains admissible, Augustine must be resentenced because the superior court was mistaken regarding the amount of jail time that had to be imposed consecutively.

Judge MANNHEIMER, concurring.

I write separately to clarify that, despite our lengthy examination of Evidence Rule 801(d)(3), our opinion in this case only addresses issues of statutory interpretation raised by the text and legislative history of the rule. Evidence Rule 801(d)(3) also potentially presents constitutional issues — issues that we have not addressed because they were not raised.

For instance, one of the legislature's primary aims in enacting Rule 801(d)(3) was to allow the State to prosecute sex abuse cases without calling the child to the stand. Rule 801(d)(3) allows the State to present its case through hearsay — primarily, through the recording of the child's pre-trial interview. The defense attorney can still call the child to the stand — but, in such cases, the child's testimony would begin with the defense attorney's cross-examination. (This is what happened with M.Y.'s testimony in Augustine's case.)

As the lead opinion explains, Evidence Rule 801(d)(3) was crafted to address a very real problem: in prosecutions for sexual abuse, our criminal justice system has traditionally required young children to repeatedly describe their experience to adults who are strangers to them, and to do so in unfamiliar and often uncomfortable environments.

But the solution chosen by the legislature — to exempt the child from direct examination if the child's pre-trial interview meets the criteria specified in Rule 801(d)(3) — has been declared unconstitutional by at least one court: the Supreme Court of Washington has ruled that a defendant's right of confrontation is violated when the State litigates a criminal case in this manner. [1]

---

[1] *See In re Personal Restraint of Grasso*, 84 P.3d 859, 863, 868 (Wash. 2004); *State v. Rohrich*, 939 P.2d 697, 702-03 (Wash. 1997).

In addition, our decision in this case does not address a separate procedural issue that has constitutional overtones: What is the State's burden of proof when it seeks to establish the foundational requirements of Evidence Rule 801(d)(3)?

In *Reutter v. State*, 886 P.2d 1298 (Alaska App. 1994), this Court addressed the constitutionality of AS 12.45.046(a)(2), a statute that allows a child victim in a sexual abuse prosecution to testify via closed-circuit television or through one-way mirrors — in other words, outside the physical presence of the defendant — "if the court determines that [taking this] testimony ... under normal court procedures would result in the child's inability to effectively communicate."

In *Reutter*, this Court held that this procedure is constitutional, but only if the government meets the foundational requirements established by the United States Supreme Court in *Maryland v. Craig*, 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990). [2]

This ruling in turn raised another question: What is the standard of proof that applies when the government seeks to establish the foundational requirements specified in *Craig*?

---

[2] The *Craig* decision, 497 U.S. at 855-56, 110 S.Ct. at 3169, requires the government to prove

[that the] use of the ... closed circuit television procedure is necessary to protect the welfare of the particular child witness who seeks to testify. The trial court must also find that the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant. ... In other words, if the state interest were merely the interest in protecting child witnesses from courtroom trauma generally, denial of face-to-face confrontation would be unnecessary because the child could be permitted to testify in less intimidating surroundings, albeit with the defendant present. Finally, the trial court must find that the emotional distress suffered by the child witness in the presence of the defendant is more than *de minimis*, *i.e.*, more than mere nervousness or excitement or some reluctance to testify.

2464

In *Reutter*, this Court rejected a "preponderance of the evidence" standard of proof. We instead held that the government must prove its foundational facts by clear and convincing evidence. We reached this conclusion because the statute authorizes a departure from the defendant's normal right of face-to-face confrontation:

> Given the constitution's express protection of confrontation as an individual right of the accused, and ... [b]ecause of the integral role confrontation plays in the adjudication of innocence and guilt, and its direct bearing on the integrity of fact-finding at trial, ... any risk of error in balancing the individual right against the countervailing public interest must fall on the side of protecting the innocent from an unjust conviction. ... [T]he preponderance of the evidence standard cannot provide such protection, and no dilution of the right [of] confrontation should be permitted without an express finding that the requirements of AS 12.45.046 ... have been met by clear and convincing evidence.

*Reutter*, 886 P.2d at 1307-08.

It is arguable that these same considerations require a court to apply a "clear and convincing evidence" standard when evaluating the State's request to admit a child's out-of-court statement under Evidence Rule 801(d)(3).

I mention these two constitutional issues, not to express any opinion regarding them, but only to clarify that our decision in this case should not be read as addressing them in any manner.